## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AH LIQUIDATION, INC., *et al.*,[1] | Case No. 21-10883 (CTG) |
| Debtors. | (Jointly Administered) |
| DRIVETRAIN LLC, in its capacity as LIQUIDATING TRUSTEE for the LIQUIDATING TRUST OF AH LIQUIDATION, INC., AH IP LIQUIDATION, INC., RM LIQUIDATION INC., BP LIQUIDATION, INC., and QAA LIQUIDATION, INC., | Adv. No. _____ |
| Plaintiff, | |
| v. | |
| DAVID FANN, PAUL COX, STEPHEN WOODY, HUMBERTO ANTUNES, and JOSEPH MCGUIRE, | |
| Defendants. | |

## COMPLAINT

Drivetrain, LLC, in its capacity as liquidating trustee (the "Liquidating Trustee" or

"Plaintiff") for the Liquidating Trust[2] as successor in interest to the debtors, AH Liquidation, Inc.

(f/k/a Avadim Health, Inc.), AH IP Liquidation, Inc. (f/k/a Avadim Health IP, Inc.), RM

Liquidation, Inc. (f/k/a Relion Manufacturing, Inc.), BP Liquidation Corp. (f/k/a Bionome

---

[1] The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: AH Liquidation, Inc. (8411); AH IP Liquidation, Inc. (7594); BP Liquidation Corp. (6483); QAA Liquidation, Inc. (5613); and RM Liquidation, Inc. (0430). A complete list of each of the Debtors in these Chapter 11 Cases may be obtained via the Bankruptcy Court at https://ecf.deb.uscourts.gov/cgi-bin/login.pl with a Public Access to Court Electronic Records ("PACER") account, which may be obtained at https://pacer.uscourts.gov.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Combined Plan and Disclosure Statement (defined herein).

Properties Corp), QAA Liquidation, Inc. (f/k/a Quality Assurance Associates, Inc.)[3] (collectively, the "Debtors" or the "Company"), hereby files the following complaint against defendants, David Fann, Paul Cox, Stephen Woody, Humberto Antunes, and Joseph McGuire (collectively, "Defendants").

## NATURE OF THE ACTION

1.    The Liquidating Trustee brings this action against certain of the Debtors' officers and directors seeking recovery for breaches of fiduciary duties, among other things, that have caused substantial damages to the Debtors.

## PARTIES

2.    Plaintiff, Drivetrain LLC is the Liquidating Trustee selected to administer the Liquidating Trust of the Debtors' estates pursuant to that certain Liquidating Trust Agreement.

3.    Defendant David Fann ("Fann") served as a director and as President of the Company. Upon information and belief, he resides in Asheville, NC.

4.    Defendant Paul Cox ("Cox") served as a director and as Vice President of the Company. Upon information and belief, Cox is currently the President and Registered Agent of Carolina Heavy Machinery, Inc., which maintains a Principal office in Beaufort, NC.

5.    Defendant Stephen Woody ("Woody") served as a director and as Chief Executive Officer ("CEO") of the Company. Upon information and belief, he resides in Asheville, NC.

6.    Defendant Humberto Antunes ("Antunes") served as a director of the Company. Upon information and belief, Antunes serves as a partner at Core Range Capital, LLC which maintains an office in New York, NY.

---

[3] *See* D.I. 283 reflecting the change of name for each of the Debtors following the sale of certain assets pursuant to a Stalking Horse APA approved at D.I. 239.

7.    Defendant Joseph McGuire ("McGuire") served as Chief Financial Officer ("CFO") of the Company.  Upon information and belief, he resides in Saint Augustine, FL.

## JURISDICTION AND VENUE

8.    The Court has subject matter jurisdiction over this adversary proceeding pursuant to 11 U.S.C. § 157 and 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

9.    Venue of the Debtors' bankruptcy cases and this adversary proceeding is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

10.    This Court has jurisdiction over the Defendants named herein because the Defendants have sufficient minimum contacts with Delaware so as to render the exercise of jurisdiction by the Delaware courts permissible under traditional notions of fair play and substantial justice.  Moreover, this Court has personal jurisdiction over the Defendants under Rule 7004 of the Federal Rules of Bankruptcy Procedure.

## STATEMENT OF FACTS

### A.  Relevant Procedural Background

11.    On May 31, 2021 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing cases (the "Chapter 11 Cases") for relief under chapter 11 of the Bankruptcy Code.

12.    On October 25, 2021, a Second Amended Joint Combined Chapter 11 Plan of Liquidation and Disclosure Statement for AH Liquidation, Inc. and Certain Affiliate Debtors was filed [D.I. 380] (the disclosure statement portion thereof, the "Disclosure Statement" and the chapter 11 plan portion thereof, the "Plan," as may be modified, supplemented and/or amended from time to time, and collectively, the "Combined Plan and Disclosure Statement").

13.     On November 5, 2021, the Bankruptcy Court entered an order [D.I. 401] approving and confirming the Combined Plan and Disclosure Statement (the "Confirmation Order"). On November 15, 2021, the Debtors and the Committee filed the *Notice of Effective Date and Entry of Order Confirming the Combined Plan and Disclosure Statement* [D.I. 403] that notified parties that the Effective Date of the Plan occurred on November 15, 2021.

14.     Pursuant to the Confirmation Order, the Liquidating Trustee was approved and appointed as the Liquidating Trustee of the Liquidating Trust, and its appointment was effective as of the Effective Date, consistent with the terms of the Liquidating Trust Agreement.

15.     The responsibilities, powers, and authority of Liquidating Trustee include, but are not limited to, "evaluating, filing, litigating, settling, or otherwise pursuing any Estate Causes of Action".  [D.I. 380 at 66-67.]  Estate Causes of Action consist of, among other things, certain claims against certain current and former directors and officers of the Debtor.

**B.  Debtors' Corporate History, Organizational Structure, and Operations**[4]

16.     Founded in 2007 by Stephen Woody, the Company was a vertically integrated healthcare and wellness business that sold topical products to improve consumers' neuromuscular health and skin barrier health, including pre-saturated towelettes, foaming, spray, and other products.  The Debtors developed products that targeted the institutional care and self-care markets, including in hospitals, long-term care facilities, closed provider pharmacies, physician offices, and retail pharmacies.

17.     AH Liquidation, Inc. ("AHI") commercialized a number of products under two brand families: Theraworx Protect that targeted institutional care and community health, and Theraworx Relief, marketed through retail pharmacies.  As of the Petition Date, the Debtors

---

[4] For additional background information, see the Declaration in Support of First Day Motion [D.I. 3].

had six marketed products—three cosmeticsproducts: Theraworx Protect for immune health, Theraworx Protect U-Pak for urinary health, and Combat One for soldier and first responder readiness; and three homeopathic drug products: Theraworx Relief for muscle cramps and spasms, Theraworx Relief for joint discomfort and inflammation, and PHUEL for topical muscle nutrition.

18.     AHI was originally incorporated under the laws of the State of Wyoming in August 2013 under the name "Avadim Technologies, Inc." In September 2013, AHI acquired and merged with Avadim, LLC, a North Carolina limited liability company that was formed and began operations in 2007 as a contractor for clinical evaluations and manufacturing. In August 2018, Avadim Technologies, Inc. was converted to a Delaware corporation, and in September 2018 changed its name to "Avadim Health, Inc." Following a Bankruptcy Court approved sale of assets, the name was changed, again, to AH Liquidation, Inc. [D.I. 283.]

19.     Woody, the Company's founder, served as AHI's CEO and a director beginning in 2013. Mr. Woody also founded and served as managing member of the predecessor company, Avadim LLC, from 2007 to 2013.

20.     As of the Petition Date, AHI was privately held. Beginning in 2017, AHI sold common stock in several private placement transactions. As of September 30, 2019, Avadim had 16,940,379 shares of common stock outstanding, held of record by approximately 1,300 stockholders.

21.     Each of the other Debtors was a wholly-owned subsidiary of AHI: RM Liquidation, Inc. ("Relion"), BM Liquidation, Inc. ("Bionome"), QAA Liquidation, Inc. ("Quality Assurance"), and AH IP Liquidation, Inc. ("AHIP"). Relion handled most of the Company's manufacturing and related needs. Bionome was a minority owner in the

commercial real estate development of a previously-planned location of the Company in Black Mountain, North Carolina. Quality Assurance managed consulting services the Company provided to third-parties. AHIP managed and maintained intellectual property and other proprietary information of the Company.

### C. **The Board & Management**

22.     At all relevant times herein, AHI's board of directors ("Board") included: (i) Fann, (ii) Cox, (iii) Woody, (iv) Charlie Owen ("Owen"), (v) Karan Rai ("Rai"), (vi) Humberto Antunes ("Antunes"), (vii) James Rosati ("Rosati"), (viii) Dewey Andrew ("Andrew"), and (ix) Linda McGoldrick ("McGoldrick").

23.     Owen was also a member of AHI's Nominating and Governance Committee ("N&G Committee").

24.     Owen, Fann, and Rosati were members of AHI's Compensation Committee.

25.     At all relevant times, each Defendant served as both a Board member and officer—with the exceptions of McGuire who did not sit on the Board, and Antunes who did not serve as an officer. At all relevant times, (i) Fann served as President; (ii) Cox also served as Vice President of the Company; (iii) Woody also served as CEO; and (iv) McGuire served as CFO.

### D. **David Fann and Paul Cox**

26.     Fann and Cox both joined the Company in 2012. However, the business relationship between Fan and Cox began several years earlier.

27.     In 2006, Fann co-founded the Florida-based company, Solar Energy Initiatives, Inc. f/k/a NP Capital Corporation ("Solar Energy").

28.     In or about January 2006, Fann, who had been acquainted with Cox through previous business transactions, contacted Cox in connection with Solar Energy's efforts to start a new business vehicle to raise capital and to invest in various renewable energy projects.

29.     In 2007, Cox was appointed to the board of directors of Solar Energy and named as CEO.

30.     Fann and Cox's business relationship became strained, when in 2008, Solar Energy, filed a lawsuit against Cox.  (*NP Capital Corp./Solar Energy Initiatives, Inc. v. Paul Cox, et al.*, No. CA08-1398 (7th Judicial Cir., St. Johns County, Fla., June 26, 2008)) ("Fann/Cox Lawsuit").

31.     In the Fann/Cox Lawsuit, Solar Energy alleged that Cox committed fraud and breached his fiduciary duties to the company. Specifically, Solar Energy alleged that Cox "wholly failed to perform the services he promised to [Solar Energy]" in order to bring Solar Energy public and "interfered with [Solar Energy's] efforts to register with the SEC." The company also alleged Cox improperly persuaded Solar Energy to invest in a company in which Cox had an undisclosed financial interest. Upon information and belief, the Fann/Cox Lawsuit was dismissed in 2009.

32.     Notwithstanding the Fann/Cox Lawsuit, Fann and Cox continued to work together at Solar Energy over the next several years.

33.     In January 2012, certain Solar Energy shareholders sued Cox, Fann, Solar Energy, and others alleging that they sold unregistered securities, made false statements in connection with the sale of securities, wrongfully and fraudulently refused to permit transfer of the securities, wrongfully refused to permit exercise of warrants, and fraudulent manipulation of the market for their benefit.  (*Amy Gustafson Schwab v. Solar Energy*

*Initiatives, Inc.,* 12-cv-00127-DSD-SER D. Minn.) (the "Solar Energy Securities Lawsuit").

34.     In 2012, soon after the filing of the Solar Energy Securities Lawsuit, Fann and Cox both left Solar Energy to join AHI.

35.     Shortly after joining the Company, in January 2013, Fann filed an individual voluntary petition under chapter 7 in the United States Bankruptcy Court for the Western District of North Carolina ("Fann Bankruptcy").

36.     During the Fann Bankruptcy, Fann failed to disclose his July 2012 employment agreement with Solar Energy. Under that agreement, Solar Energy was obligated to and paid him a $120,000.00 salary through June 2015. In February 2013, Solar Energy and Fann agreed to the termination of this agreement and resolution of all amounts due to Fann in return for a one-time payment of $10,000.00. Upon information and belief, at the same time, Fann was improperly receiving unemployment benefits. Subsequently, Fann's chapter 7 trustee made a claim against the non-exempt payment to Fann from Solar Energy. Fann eventually turned over the funds to the estate and settled the trustee's claim.

37.     Fann received a discharge in March 2014.

38.     In January 2014, the Solar Energy Securities Lawsuit ended—while Fann and Cox were at AHI—with, among other things, a $750,000 judgment rendered in favor of the plaintiffs.

39.     The Fann Bankruptcy case was closed on December 1, 2014.

40.     Neither Fann nor Cox ever disclosed the Fann/Cox Lawsuit or the Solar Energy Securities Lawsuit to the Company. On information and belief, although Fann may have mentioned a "prior bankruptcy," he implied that the bankruptcy was filed in the distant past— not that it was filed after he began working with the Company.

41.     Details about these lawsuits and the Fann personal bankruptcy only came to light years later as a result of diligence performed in connection with the Company's anticipated Initial Public Offering ("IPO"), discussed in more detail below.

42.     In November 2019, just weeks before the targeted kickoff of a years-anticipated IPO process, the Board first learned about the Fann/Cox Lawsuit, the Solar Energy Securities Lawsuit, and the Fann Bankruptcy. The fact that (i) Fann and Cox hid this information from the Board, and (ii) the Board was not aware of Fann's and Cox's respective backgrounds, demonstrates that the Board failed to perform, or have procedures in place to perform, the bare minimum amount of due diligence required relating to its C-suite, was not well-informed, and was not acting in the best interests of the Company by hiring and continuing to employ both Fann and Cox without considering these red-flags.

**E.  Stephen Woody**

43.     Woody started his career working for a surgical equipment manufacturer. Then in 1997, he established a consultancy to launch other medical device companies.

44.     In 2002, Woody formed G3 Packaging, a company that provided contract packaging for medical devices.

45.     In 2006, the developer of a bacterial wash was searching for a partner to help commercialize their product (now known as Theraworx). Woody seized the opportunity and founded Avadim, LLC in 2006, which later merged into AHI. He served as CEO and as a member of the Board of AHI since September 2013.

**F.  Humberto Antunes**

46.     Antunes joined AHI's Board in February 2017.

47.     Prior to joining AHI, Antunes served as served as co-founder of Nestlé Skin

Health, as well as president Galderma.

### G. **Joseph McGuire**

48.     McGuire joined the Company as CFO in October 2014.

49.     Prior to joining AHI, McGuire held management positions with Dean Witter Reynolds, Paine Webber, Inc.; Price Waterhouse; and John W. Henry & Co.

### H. **Fann And McGuire's Misconduct Related to Fan's 2018 Bonus**

50.     On November 14, 2018 – unbeknownst to AHI's other Board members and in violation of his employment contract – Fann pressured McGuire to approve a "down payment" or "advance" on his not-yet-approved 2018 annual performance bonus in the amount of $129,600.

51.     McGuire and Fann knew or should have known that the "down payment" was improper and not approved by the Board. Nevertheless, McGuire facilitated the "down payment", which was paid to Fann on or about November 14, 2018.

52.     Thus, even though Fann was paid a salary of $360,000 in 2018, he also orchestrated receipt of an additional $129,600 by coercing McGuire to approve and issue the "down payment".

### I. **Late Revelations about Fann & Cox Adversely Impacts IPO Efforts**

53.     In 2019, AHI began preparing for an IPO, which was scheduled to occur in early in 2020. As part of that process, the Company retained certain professionals to perform due diligence on the Company, and its directors and officers.

54.     In November 2019, just weeks before the targeted kickoff of the IPO process, the professionals advised the Board of the existence of the Fann/Cox Lawsuit, the Solar Energy Securities Lawsuit, and the Fann Bankruptcy. None of these proceedings had been

previously disclosed by Fann or Cox to the Board.

55.    As a result, the Board was advised by its professionals that the Company needed to disclose the Fann/Cox Lawsuit, the Solar Energy Securities Lawsuit, and the Fann Bankruptcy in its next Securities Exchange Commission ("SEC") S-1 Filing ("S-1").[5]

56.    In a last-minute attempt to mitigate potential detrimental impacts on the IPO process caused by the Fann and Cox revelations, the Board directed Cox to immediately resign his positions on the Board and as Vice President of the Company. Members of the Board appear to have wished to have Fann resign from the Board as well. However, it was concluded that two resignations on the eve of the IPO would have been more problematic than the selected alternative – albeit similarly awkward – which was to have limit Fann's term on the Board and disclose that he would resign concurrently with the completion of the Company's IPO.

57.    The disclosure relating to Fann should never have been required to occur. Fann's fiduciary duty to the Company required him to step aside. The fiduciary duties of the other defendants required them to compel him to step aside since he did not do so voluntarily. The solution architected by the Company (to have the president resign concurrently with the IPO) operated as a massive red flag to potential investors. And the decision to go down that path irreparably damaged the Company's IPO and its ability to court investors.

58.    Nevertheless, the Board directed the Company to amend its S-1 to disclose both the lawsuits, Fann's bankruptcy, as well as the changes in Board makeup.

---

[5] In connection with the IPO, the Company was required to complete a Securities Exchange Commission ("SEC") S-1 Filing ("S-1"). The Company submitted a confidential S-1 to the SEC in 2019. The S-1 was to be updated immediately before the IPO process would start in January 2020. An S-1 is the initial registration form for new securities that the SEC requires for public companies that are based in the United States. As part of the S-1, companies are required to disclose, among other things: (1) information on the planned use of capital proceeds, (2) details regarding the company's current business model and competition, (3) a brief prospectus of the planned security, and (4) pricing methodology.

59.     At least one non-party Board member concluded that if they had been made aware of Fann's and/or Cox's background earlier, they would not have joined the Board in the first place. Moreover, these late and significant disclosures and changes to the Board makeup adversely impacted the Company's IPO process, contributing to its eventual failure. This S-1 debacle increased the S-1's cost and expense and, on information and belief, irreparably damaged the relationship between the Board and Company management.

**J.    Fann Misconduct Related to AHI's S-1**

60.     On December 18, 2019, Fann received and reviewed a draft of the amended S-1 that had been prepared by Company counsel ("Amended S-1").

61.     Unbeknownst to the Board, Fann unilaterally made material changes to the document ("Material Changes"). The Material Changes included: (i) removal of Owen from the Compensation Committee immediately subsequent to the IPO, (ii) removal of Owen as Chairman of the N&G Committee immediately subsequent to the IPO, and (iii) changing the Board terms of Owen and another board member from three years to one year.

62.     Although Fann was advised and knew that Board was required to review, approve, and execute a signature page for the Amended S-1, Fann failed to disclose the Material Changes to the Board.

63.     On December 27, 2019, Fann emailed AHI's full Board ("December 27 Email"): "Attached is the S1 signature page that Cooley wants us to have in today if possible. Hopefully, we will receive a revised S1 later today with minor edits and or changes."

64.     The December 27 Email contained four separate acts of deceit and/or the willful withholding of information from the members of the Board, including:

a.  Fann's failure to disclose the Material Changes that had been made to the Amended S-1;

   b.  Fann's failure to send the Board the Amended S-1 that he had previously received which included the Material Changes;

   c.  Fann's request that the other Board Members execute the signature page of the Amended S-1 prior to actually sending them a copy of the Amended S-1 to review; and

   d.  Fann's representation that the to-be-circulated Amended S-1 had only "minor edits" (even though Fann knew this statement was false).

   65.   On December 28, 2019, Fann emailed the Company's attorney what he represented were fully-executed signature pages.

   66.   Meanwhile, Fann had also spent part of December 31, 2019 ostensibly attempting to avoid sharing the Amended S-1 and not contemplating a Board meeting to review it before its filing.   On December 31, 2019 [10:01 PM], Fann sought and obtained confirmation that he theoretically could file the S-1 without further Board review. Fann wrote to counsel, "Now that we have all board signatures do we also need a board resolution to file the S1?"   Counsel confirmed that a prior unanimous written consent authorized filing the S-1. Fann shared that confirmation with the Board.   On information and belief, this reflected Fann's effort to file the S-1, with the Material Changes, and without further Board review.

   67.   This prompted reaction from various board members. On December 31, 2019, Owen confirmed that neither he, nor any other Board Member had received the Amended S-1, and demanded that the Amended S-1 be circulated to the Board for approval. Specifically, Owen wrote to Fann:

   You have continually said a final copy [of the S-1] was being sent for us to read. We need to have the opportunity to read the S-1 before it is filed. We have received nothing. The Board should have the opportunity to read the document since ultimately we, the Board, are accountable to the shareholders. I want to see the section . . . about changes in Board Committee structure. [We have been advised] there may be questions about that. Committee structure would normally be handled by the governance committee.

68.    The Company's attorneys were surprised by Owen's comments, and confirmed that they were under the false impression (provided by Fann) that the full Board had reviewed and approved the Amended S-1.

69.    In response to Owen's email, Fann finally sent the Amended S-1 to the full Board for review and approval later at approximately 6:00 p.m. EST on December 31, 2019.

70.    The other Board members were shocked to discover the Material Changes that had been made to the Amended S-1.

71.    Thereafter, multiple Board members confirmed they were unaware of the Material Changes and were withdrawing their signatures to the Amended S-1. For example, Board Member Karan Rai responded:

> [T] he board had no idea about the proposed board and sub committee [sic] changes effective post IPO- these proposed changes were never discussed with the board as a whole and was a total surprise to all independent Board members including me. We found out by reading the amended S-1[.]  Looks like Management might have over[-]stepped their bounds here. We will caucus as a board tomorrow and figure out how to move forward.

72.    Similarly, Owen responded:

> This S-1 has been written without any Board review or discussion. We ha[d] no idea about Committee or Board structure changes. I am not planning to leave the Board in April. This version has not been discussed with me. I will review tomorrow. Until you hear from me directly, my signature page has been withdrawn. We have been told the S-1 [sic] it was close to being ready . . . but the management team keeps withholding it. Not acceptable. I now see why. Until I have had a chance to fully review and give consent, this should not be filed . . . .

73.    At the same time Fann apparently was attempting to file the S-1 with Material Changes and without Board oversight, Boardmember McGoldrick was trying to schedule an Audit Committee meeting for early in the new year. On December 31, 2019, McGuire wrote to Fann and Woody that he was "trying to push off the [Audit Committee] meeting" and McGoldrick was "pushing back." Fann replied stating "Stand firm, you're the boss, she is just to provide

oversight." McGuire received a compromise proposal for a meeting from McGoldrick that he shared with Fann and Woody. Fann again directed McGuire to not cooperate, writing "Stand firm young man, or are you from Jersey".

### K. Additional Defendant Misconduct

#### i. The Company Paid for Fann's Country Club Membership

74.     While he was employed by AHI, Fann obtained reimbursement for his membership at The Cliffs At Walnut Cove, a country club. Fann's reimbursement was: (i) not disclosed in writing to the Board, (ii) improper, and (iii) violated the terms of the Company's Travel and Expense Policy. On information and belief, the total amount reimbursed to Fann was not less than $60,000 and the reimbursements were sent to, and ultimately approved by, McGuire.

#### ii. Family Relationships Among the Staff

75.     Over the years, Defendants knowingly permitted the Company to employ approximately 17, or more, individuals who were related to existing staff members, including key executives. For example, Fann's son (Brett Fann), wife (Debbie Fan), and brother-in-law (John Hand) were all employed by AHI. In fact, John Hand was the immediate supervisor of his sister Debbie Fann. Corporate records do not show that these insider relationships and significant insider transactions were approved by the Board. On information and belief, in 2021 along (including 2020 bonus payments) the Company spent more than $2.5 million for salaries, bonusses, and benefits for these individuals.

76.     Prior to the filing of the S-1, the Company did not have, and the Board did not implement a formal policy regarding approval of transactions with related parties.

#### iii. Defendants Ignore Board Directives

77.     In or around January 2021, Owen – then the chairman of the Board – issued a

directive that the Company reduce salaries of upper management by 10%. Fann and Woody refused to implement this directive, as it would have impacted their own salaries.

### iv.    Significant Accounting Errors

78.    As CFO, McGuire was tasked with overseeing the Company's finances. However, during his tenure, McGuire had no active role in providing any financial modeling for the Company, such as projections, forecasting, and/or any proactive analysis of the Company's finances. Instead, Woody and other employees of the Company attempted to fill this void. Moreover, during McGuire's tenure, the Company made significant accounting errors – such as the Company's gross margin calculation for July-September 2020 – that McGuire knew or should have known were incorrect that on information and belief caused the Company injury.

79.    On information and belief, Fann and McGuire also conspired on several occasions to improperly manipulate the Company's financials to make it look more profitable. For example, Fann directed McGuire to delay an already overdue payment to the Company's auditors so that the Company's lender would see more cash in the financials and a $2 million payment to a vendor writing "If it goes before 11-1 I will be very upset".

80.    Fann also pressured McGuire to classify a consignment sale as a regular sale, in order to boost net revenue at year end, which he did. This resulted in the Company overstating its revenues by at least $1 million. This error was ultimately caught and remedied by the Company's outside auditors.

81.    As CFO, McGuire knew or should have known that Fann's directives and McGuire's own actions were deceptive and improper.

### L.    Defendants' Poor Leadership Causes the Company's Insolvency

82.    During Defendants' tenure, the Company suffered from a general lack of liquidity,

increased indebtedness, and failed to raise adequate capital for its operations. As a result, the Company experienced negative cash flows and, ultimately, an unsustainable balancesheet.

83.    By way of example, the Company's net losses were $49.5 million, $34.8 million, and $53.6 million for the years ended December 31, 2018, 2019, and 2020, respectively. As of March 31, 2020, the Company: (i) had term loans payable in the amount of $57 million; (ii) owed vendors $11 million; and (iii) had outstanding convertible notes totaling $5.9 million. As of August 10, 2020, AHI: (i) was in forbearance with its lenders because of covenant violations; (ii) failed to meet planned net revenue and profitability targets; and (iii) failed to implement a budget plan. Notwithstanding, the Company's failing financial health, Fann and the Defendants continued to recklessly spend more than $1 million on the IPO process that ultimately – and predictably – failed.

84.    In 2018, the Defendants directed the Company to enter into a $40 million debt financing transaction with Hayfin Capital Management ("Hayfin"). However, Defendants knew or should have known, the Company could not service this debt, and additional financing would still be necessary. Nevertheless, Defendants caused the Company to press forward prematurely to an ill-timed, incredibly expensive, and ultimately unsuccessful IPO.

85.    During this time, the Company also incurred significant expenses and built-up excess inventory, as well as increased media/marketing expenditure that caused the Company's marketing expense ratio ("MER") to increase to an unstainable level. The Company's marketing partner urged Fann to use the marketing budget for efficiently, but Fann ignored their advice and spent hundreds of thousands of dollars to produce expensive television ads that were ineffective and a waste of the Company's money.

## COUNT I
## Breach of Fiduciary Duties
## (Against the Defendants)

86. Plaintiff repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

87. A claim for breach of fiduciary duty requires proof of two elements: (i) that a fiduciary duty existed and (ii) that a defendant breached that duty.

88. At all relevant times, each of the Defendants was a director and/or officer of the Company.

89. As officers of the Company, Defendants each owed fiduciary duties of care and loyalty to the Company and its shareholders. As directors of the Company, defendants Fann, Cox, and Woody each owed fiduciary duties of loyalty to the Company and its shareholders. Those duties required the Defendants to act in good faith in a manner reasonably believed to be in the best interests of the Company.

90. As directors and officers of the Company, the Defendants also owed the Company the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its assets, and the highest obligations of fair dealing.

91. The Defendants, because of their positions of control and authority as directors and/or officers of Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

92. The Defendants repeatedly abdicated their duties and responsibilities owed to the Company when they put their own financial interests ahead of the Company, acted in bad faith, and failed to act in the best interests of the Company by engaging in, *inter alia*, the above-described conduct.

93.     The Defendants approved and engaged in self-dealing and self-interested transactions that benefitted themselves and/or their fellow board members or officers, which resulted in transactions that were unfair to the Company and harmed the Company.

94.     Each of the Defendants knew or should have known that the Defendants were engaging in self-interested and self-dealing transactions for the benefit of the Company and yet allowed these transactions to continue and/or failed to adequately inform themselves of such decisions and transactions, acting with gross negligence in doing so. Thus, the Defendants engaged in gross negligence and failed to act on an informed basis.

95.     These breaches of fiduciary duties resulted in millions of dollars in damages, significantly contributed to the Debtors' insolvency, and constituted actions well below the care an ordinarily prudent person in a like position would exercise under similar circumstances.

96.     As detailed herein, the Defendants repeatedly and continuously breached their duties including, but not limited, by:[6]

>    a.     Each of the Defendants knew or should have known of the impact of these wrongful acts and omissions that were not in the best interests of the Company and which were unfair to the Company.
>
>    b.     Each of the Defendants engaged in and/or allowed the Company to engage in a variety of self-dealing and self-interested activities and transactions that were unfair to the Company.
>
>    c.     Each of the Defendants, as directors or officers of the Company, approved the wrongful acts and/or allowed such wrongful acts to continue, failed to

---

[6] This list is a summary and provides example of the Defendants breaches, which are set forth in detail in the specific allegations asserted in the Complaint above.

reasonably inform themselves with respect to such wrongful acts, and rubberstamped transactions and activities that benefitted themselves.

d.      Each of the Defendants acted in bad faith and/or engaged in gross negligence with respect to the wrongful acts.

e.      Each of the Defendants failed to act with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

f.      Each of the Defendants' breaches of their fiduciary duties, including their duties of loyalty and care, directly and proximately caused the unnecessary dissipation of the Company's assets and multiple millions of dollars of damages to be incurred by the Company.

g.      Each of the Defendants' breaches of their fiduciary duties to the Company directly and proximately caused the Debtors' creditors to be deprived of assets that would have otherwise been available in the underlying bankruptcy case.

WHEREFORE, the Liquidating Trust demands judgment against Defendants, David Fann, Paul Cox, Joseph McGuire, Humberto Antunes, and Stephen Woody for compensatory damages, pre-judgment interest, post-judgment interest, attorneys' fees, and all other relief which the Court deems proper.

## COUNT II
## Waste of Corporate Assets
## (Against the Defendants)

97.      Plaintiff repeats and re-alleges the allegations contained in all of the preceding and following paragraphs of this Complaint as if the same were fully set forth herein at length.

98.      As more fully described above, the Defendants caused the Company to engage in

the above-described acts, resulting in loss suffered by the Company.

99.    The Defendants wasted cash and valuable assets of the Company to the detriment of the Company and its creditors and for the benefit of the Defendants.

100.    As detailed herein, the Defendants were aware of, should have been aware of and/or allowed and caused the Company to engage in the wrongful acts despite that such acts were unfair to the Company.

101.    The wrongful acts served no corporate purpose and no ordinary, reasonably prudent person would have permitted them.

102.    Moreover, the Defendants engaged in self-dealing and/or allowed the self-dealing and one-sided transactions described herein for the benefit of themselves that resulted in the Company's loss of substantial sums of capital and corporate waste.

103.    As a result of the misconduct described herein, the Defendants wasted corporate assets, namely funds, by failing to properly consider the best interests of the Company.

WHEREFORE, the Liquidating Trust demands judgment against Defendants, David Fann, Paul Cox, Joseph McGuire, Humberto Antunes, and Stephen Woody for compensatory damages, pre-judgment interest, post-judgment interest, attorneys' fees, and all other relief which the Court deems proper.

## COUNT III
### In the Alternative, Aiding and Abetting Breach of Fiduciary Duty
### (Against All Defendants)

104.    Plaintiff repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

105.    Alternatively, each Defendant took numerous actions as detailed above that enabled other Defendants to breach their fiduciary duties.

106.    The Defendants enabled the breach of fiduciary duties owed to the Company by other Defendants.

107.    By their wrongful acts and omissions, these Defendants caused harm to the Company, its shareholders, and its creditors.

108.    Accordingly, such Defendants are liable to the Company for aiding and abetting the breach of fiduciary duties by the other Defendants in an amount to be determined at trial.

WHEREFORE, the Liquidating Trust demands judgment against Defendants, David Fann, Paul Cox, Joseph McGuire, Humberto Antunes, and Stephen Woody for compensatory damages, pre-judgment interest, post-judgment interest, attorneys' fees, and all other relief which the Court deems proper.

## COUNT IV
## Unjust Enrichment
## (Against All Defendants)

109.    Plaintiff repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

110.    To establish a claim for unjust enrichment, a plaintiff must prove: (i) an enrichment or benefit conferred that is accepted by defendant, (ii) an impoverishment or a detriment sustained by the plaintiff as a result of the enrichment/benefit, (iii) the enrichment/benefit was not conferred gratuitously or by interfering in the affairs of the other party, (iv) the absence of justification, and (iv) the absence of a remedy provided by law.

111.    As alleged herein, in the absence of justification, the Defendants benefited to the detriment of the Company as a result of the aforementioned actions.

112.    The Company is without an adequate remedy at law.

WHEREFORE, the Liquidating Trust demands judgment against Defendants, David Fann,

Paul Cox, Joseph McGuire, Humberto Antunes, and Stephen Woody for compensatory damages, pre-judgment interest, post-judgment interest, attorneys' fees, and all other relief which the Court deems proper.

Dated:   July 15, 2022
             Wilmington, Delaware

**FOX ROTHSCHILD LLP**

*/s/ Maura L. Burke*
Seth A. Niederman (DE No. 4588)
Maura L. Burke (DE No. 308222)
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
Telephone: (302) 654-7444
Facsimile: (302) 656-8920
Email: sniederman@foxrothschild.com

-and-

Michael A. Sweet (*admitted pro hac vice*)
345 California Street, Suite 2200
San Francisco, California 94104
Telephone: (415) 364-5540
Facsimile: (415) 391-4436
Email: msweet@foxrothschild.com

-and-

Gordon E. Gouveia (*admitted pro hac vice*))
321 North Clark Street, Suite 1600
Chicago, IL 60654
Telephone: (312) 980-3816
Facsimile: (312) 517-9201
Email: ggouveia@foxrothschild.com

*Counsel for the Liquidating Trust*
